**2026 UT App 42**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
FREDRICK DEE DURFEE,
Appellant.

Opinion
No. 20230410-CA
Filed March 26, 2026

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 201900069

Staci Visser and Dain Smoland,
Attorneys for Appellant

Derek E. Brown and Karen A. Klucznik,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1      A jury convicted Fredrick Dee Durfee of object rape. He appeals his conviction, asserting that his trial counsel rendered constitutionally ineffective assistance and that the trial court made an improper evidentiary ruling regarding the scope of the State's cross-examination of a potential witness. We reject Durfee's arguments and affirm his conviction.

## BACKGROUND[1]

¶2 On the day after Christmas, Durfee invited Eliza[2] over to his house and offered to make brunch for her. Durfee had originally met Eliza through an online dating app, and prior to this occasion, the two had seen each other "two, possibly three other times." During those prior interactions, Durfee and Eliza never had sexual intercourse, although they had "attempted it once" before. On this occasion, Eliza accepted Durfee's invitation and went over to his house, which he shared with a roommate (Roommate).

¶3 Although Eliza had not initially gone to Durfee's house "for the purpose of consensual sexual activity," that expectation changed a few hours after she arrived. At first, Durfee and Eliza just lay "in . . . bed and chatted." As the conversation evolved, the two of them discussed "what would and wouldn't be okay" in terms of anticipated sexual activity. During that conversation, Eliza told Durfee that she "enjoy[ed] rough sex," but with "limitations." She "made it very clear that no marks were to be put on [her] body," and Durfee agreed. Eliza and Durfee also discussed "fisting,"[3] but she told him she "wasn't ready for that" and that it was something she "would have to build up to."

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up).

2. A pseudonym.

3. As discussed at trial in this case, "fisting" means "putting one's entire fist . . . inside another's body orifice."

¶4     Durfee and Eliza then began having consensual sex, an encounter that lasted "off and on over a period of two or three hours." All parties to this appeal agree that, for the first hours of activity, the sex was "rough" but consensual.

¶5     But later, perspectives on the encounter began to diverge, especially regarding one issue. Durfee was manually penetrating Eliza with his fingers, while he "knelt" "at the foot of his bed." In this position, Eliza could not see exactly what Durfee was doing, and for a while it "felt really good" to her. Suddenly, however, it became excruciatingly painful for Eliza, who felt like her "uterus popped" and Durfee "had put his whole hand in [her]." She recalled that, at this point, she told Durfee, "Oh, you have to stop. Oh, my gosh that hurts. Stop, you're killing me." But Eliza later testified that, instead of stopping, Durfee said, "Oh, yeah, you want me to punch you in the pussy?," to which she responded, "No, absolutely not. You're already hurting me." Despite Eliza's withdrawn consent, Durfee "repeatedly punched [her] in the cervix," "over and over." Eliza said that Durfee did this seven times until she was able to shove him away with her legs.

¶6     After the activity stopped, Durfee initially acted very concerned for Eliza's well-being. He "immediately" asked her what was wrong and if he had done "something that had hurt" her. Durfee told her that he hadn't "realize[d] that . . . [she] had said to stop." He helped her to shower and clean off because she had blood running down her legs and "it was not letting up." After she had cleaned up, Durfee "talked [her] into . . . lying down with him," even though she was still bleeding.

¶7     At some point during the post-sex discussion, however, Durfee's demeanor changed and he became angry. As Eliza recalled it, Durfee began to insist that "the blood had to all be cleaned up right then." He handed Eliza a "bottle of Clorox spray cleaner" and told her to get down "on [her] knees" and "clean [it] up." Eliza tried to help with the cleanup, but she felt "weak from

all of the blood loss." At some point, Durfee suggested that he accompany her to the hospital, but he stated that she would have to drive because he was not able to drive. Eliza, however, was in no condition to drive, and eventually Roommate took Eliza to the hospital emergency room.

¶8 After Eliza arrived at the hospital, Durfee sent her a series of text messages. In the messages, he accused Eliza of lying about something Roommate had said, and he even told her, "I took pictures and have a recording. See you in court." Eventually Eliza stopped responding, but Durfee continued to send additional messages that Eliza considered threatening and "nasty."

¶9 While at the hospital, Eliza was treated for her injuries by several doctors and nurses. In speaking with the medical providers, Eliza described the incident—at least initially—as a "misunderstanding," explaining that she didn't think Durfee had been "able to absorb" her telling him "no." She was eventually examined by a sexual assault nurse examiner (Expert), who documented Eliza's injuries. Those injuries included many abrasions, lacerations, and bruises in Eliza's anogenital area, including a laceration on her cervix. The medical providers found it necessary to place two stitches in her cervix to stop the continued bleeding from that wound.

¶10 During Eliza's time at the hospital, the police were called, and they went to interview Durfee. In that interview, Durfee denied ever using the term "pussy punch." He claimed that he "[didn't] even know what that would be" and that he had "never fisted anybody" in his life. Durfee also told police that he didn't think Eliza had ever withdrawn her consent, explaining, "[T]here was never anything that she said no [to]. There was never any time she said no." He insisted that if Eliza had said no at any time, he would have complied. And he consistently denied using his entire fist during the sexual encounter, but he did suggest he "could have been" using all four of his fingers without his thumb.

¶11 As a result of the incident, the State charged Durfee with—as relevant here[4]—one count of object rape, a first-degree felony. The case proceeded to trial.

¶12 Shortly before the trial was set to begin, Durfee filed a motion indicating that he wished to present character evidence through a "former romantic partner" (Ex-Girlfriend) who could testify that Durfee was the sort of person who respected his partner's wishes during sexual activity. In that motion, Durfee asked the court to "[s]trictly limit the scope of" the State's potential cross-examination of Ex-Girlfriend; in particular, Durfee was concerned that the State planned to ask Ex-Girlfriend about an "alleged violation of a protective order" by Durfee. Durfee asserted that the State's cross-examination should be limited "to the trait that is the subject of that witness's direct examination," which Durfee characterized as respect for consent during sexual activity. He asserted that his decision to call Ex-Girlfriend "ought not open the door for the State to use the character witness as a vehicle for impugning *separate* character traits."

¶13 On the morning of the first day of trial, the court and the parties discussed Durfee's motion. During this discussion, Durfee's trial attorney (Counsel) indicated that he intended to "strictly" ask Ex-Girlfriend whether Durfee "respect[ed] [her] consent" during sex. The court clarified with Counsel that Ex-Girlfriend was also "a victim in a protective order violation" case involving Durfee. After the discussion, the court ruled in favor of Durfee, ordering that any evidence that Durfee violated a protective order be excluded, while still allowing Counsel to present character evidence, through Ex-Girlfriend, that Durfee "respects the consent of his sexual partner."

---

4. In the original charging document, the State also charged Durfee with two counts of obstructing justice. Those counts were dismissed at the preliminary hearing.

¶14    Once trial began, the State presented testimony from five witnesses in its case-in-chief—Eliza, Roommate, two detectives, and Expert. These witnesses testified in accordance with the facts recited above.

¶15    In testifying about her examination of Eliza, Expert described Eliza's injuries, and she explained those injuries using various charts and a written report she had created after the examination. Expert stated that she had conducted "[a]round 500" similar examinations in her career. Then, the prosecutor engaged in the following colloquy with Expert:

> Q:  Based on your hundreds of examinations, was [Eliza's] injur[y] consistent with the report of assault and medical history she gave you?
>
> A:  Yes, it was. Lacerations of the cervix are rarely seen. Generally they're either caused by objects or possible fingernails, but the skin inside there is pretty tough and consensual intimacy isn't going to cause those types of injuries.
>
> . . . .
>
> Q:  Comparing this examination to the hundreds of other examinations you've done, where does it fall in its severity of injury?
>
> A:  Yes. Maybe 50 percent of the exams I have done have genital injury. Generally there is one or two injuries. This particular case has a great deal of injury, probably one in the top five that I have seen.
>
> . . . .

> Q: [D]o you generally see lacerations from penises in consensual vaginal sex?
>
> A: There isn't much research related to injuries with consensual sex.
>
> Q: Could you talk to us a little bit about the structure of the penis insofar as thinking about whether it would cause blunt force trauma?

At this point, Counsel objected and argued that Expert was testifying outside of her "expertise." The court overruled this objection, and Expert answered the question as follows: "[G]enerally very rarely have I ever seen internal injury where the patient has described that it was a penis in her vagina."

¶16 During cross-examination, Expert again stated that "there's not a lot of literature on injuries suffered during consensual sex." Counsel then asked, "So when you say that the injuries are consistent with what . . . [Eliza] said, you aren't able to exclude the possibility that these injuries are the result of consensual sex, are you?" In response, Expert said, "Is . . . injury possible in consensual sex? I'm sure it probably is."

¶17 On the morning of the next trial day, Counsel wanted to address additional concerns he had regarding Ex-Girlfriend's testimony, which he wished to present that day. Counsel notified the court that the State had called Ex-Girlfriend the night before and that Ex-Girlfriend "felt it was a very harassing phone call." In response, the State offered to preview the questions it intended to ask Ex-Girlfriend on cross-examination. In particular, the State indicated that it planned to ask Ex-Girlfriend whether Durfee had ever lived with her in her own home, whether she had ever asked him to leave that home, and whether Durfee had complied with such requests. The State believed that Ex-Girlfriend, if asked, would testify that she had once "told [Durfee] to leave, [and] he refused to." The State asserted that this line of questioning was

relevant to show that Durfee did not always respect the wishes of his romantic partner; indeed, the State compared a person's home to a person's body, arguing that a home "is a place like one's body where you have the right to say, 'Leave,' or, 'No, I don't want you to'" do something. For his part, Counsel argued that this line of questioning was improper, because in his view the State should be limited to asking about the specific trait at issue, which Counsel continued to characterize as respect for consent during sex. Specifically, Counsel argued that "[b]eing a considerate lover is not the same trait as whether you're a good . . . tenant."

¶18 A discussion ensued, with the court offering its view that if the defense offered "evidence of a pertinent character trait . . . by specific instances," then the State would "get to rebut it with specific instances." At one point, the court offered these thoughts:

> Seems to me that this is the situation that we're in: If the [d]efense under [rules of evidence] 404 and 405 . . . offers pertinent character traits of the defendant—a specific act; a specific set of circumstances; . . . specific conduct; can't limit it to just sexual stuff—the other side gets to rebut it with specific conduct; right?
>
> . . . .
>
> But as a general principle, I think that is legally correct. You do specific instances; they get specific instances. You bring character up by opinion or reputation; they get to rebut it by opinion or reputation.

Counsel seemed to agree with how the court described the situation, but he wanted additional clarification on the scope of what the State would be allowed to ask Ex-Girlfriend on cross-examination. The court reiterated that it would not allow the State to ask Ex-Girlfriend about the protective order, but it stated that

it would be inclined to allow the State to ask about requests Ex-Girlfriend had made to Durfee to leave her house. In the court's view, whether Ex-Girlfriend told Durfee "to stay away," and whether Durfee complied with that request, were appropriate subjects for cross-examination and "an appropriate piece of rebuttal evidence." Counsel then asked to "do an offer of proof" of Ex-Girlfriend's testimony "outside the presence of the jury," and the court agreed.

¶19 During the previewed testimony, Ex-Girlfriend stated that Durfee was "considerate" and that when she was "not in the mood," Durfee "did not want to move forward if . . . [she] wasn't up for it." And she also stated that at one point she asked Durfee to leave her home and he refused to comply.

¶20 After the previewed testimony, the court finalized its ruling allowing the State to rebut Ex-Girlfriend's character testimony with its own character evidence. The court ruled "that if [Counsel] offer[s] specific instances of [Durfee's] character," including evidence of "situations where he is told no" and then "follows that" command, then the State would "get to put on a specific instance of conduct outside of the sexual context where he was told no . . . and didn't comply with it." In light of the fact that the court ruled that the State would be permitted to ask Ex-Girlfriend about whether she had asked Durfee to leave her house, Counsel and Durfee made the decision not to call Ex-Girlfriend to testify in front of the jury.

¶21 At the conclusion of the trial, and after deliberation, the jury found Durfee guilty as charged. The trial court later sentenced Durfee to prison.

ISSUES AND STANDARDS OF REVIEW

¶22 Durfee now appeals his conviction, and he asks us to consider two issues. First, he asserts that Counsel rendered

ineffective assistance. "When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law." *State v. Rivera*, 2022 UT App 44, ¶ 21, 509 P.3d 257.

¶23    Second, Durfee challenges the trial court's evidentiary ruling regarding the allowable scope of the State's cross-examination of Ex-Girlfriend. "We review a trial court's evidentiary rulings for an abuse of discretion and its interpretation of evidentiary rules for correctness." *Rothwell v. Rothwell*, 2023 UT App 50, ¶ 34, 531 P.3d 225 (cleaned up).

ANALYSIS

I.  Ineffective Assistance Regarding Expert's Testimony

¶24    First, Durfee asserts that Counsel rendered constitutionally ineffective assistance. To succeed on such a claim, Durfee must make a two-part showing: that (1) Counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Failure to prove either component is fatal to the claim; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Thus, "if either is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up).

¶25    The first part of this test requires Durfee to show that Counsel's performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (cleaned up). In evaluating an attorney's performance, courts often examine whether the attorney had a strategic reason for taking the

challenged action. *See id.* ¶ 35. And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34.

¶26     In this case, Durfee asserts that Counsel rendered ineffective assistance by not objecting to one discrete part of Expert's testimony. Specifically, Durfee takes issue with the way Counsel handled the portion of Expert's direct examination testimony in which the prosecutor asked whether Eliza's injuries were "consistent with the report of assault and medical history" Eliza provided, and Expert responded with these three sentences:

> Yes, it was. Lacerations of the cervix are rarely seen. *Generally* they're either caused by objects or possibly fingernails, but the skin inside there is pretty tough and *consensual intimacy isn't going to cause those types of injuries*.

(Emphasis added.) Durfee characterizes this testimony as Expert offering an opinion that Eliza's specific injuries "could not have resulted from consensual sex." And based on his characterization of Expert's testimony, he asserts that the testimony contained an impermissible legal conclusion, amounted to an opinion on the ultimate issue in this case, and—in tandem with Expert's statement that Eliza's injuries were "in the top five" out of the hundreds she had seen—was "anecdotal statistical testimony."

¶27     Durfee's argument depends entirely on the accuracy of his interpretation of the challenged portion of Expert's testimony. But that interpretation—while perhaps not unreasonable—is hardly the only reasonable one. Indeed, another entirely reasonable interpretation is that Expert made no statement at all about

whether Eliza's specific injuries were caused by non-consensual conduct but, instead, simply offered background testimony about whether "[l]acerations of the cervix" are "[*g*]*enerally*" caused by "consensual intimacy." (Emphasis added.) Expert began the sentence in question with the word "generally," which quite naturally leads to the conclusion that Expert was speaking generally about such injuries and was not intending to opine that Eliza's specific injuries were or were not caused by non-consensual actions. After all, the question to which Expert was responding was not whether Eliza's injuries had conclusively been caused by non-consensual actions; rather, the prosecutor had asked Expert whether Eliza's injuries were "*consistent with* the report of assault and medical history" Eliza provided. (Emphasis added.) Expert was not being asked to offer an opinion on the conclusive cause of Eliza's specific injuries, and Counsel could have reasonably interpreted Expert's testimony as offering only broad thoughts about these sorts of injuries.

¶28    So interpreted, Expert's challenged statement is entirely proper. Questions that are "phrased in terms of whether various symptoms were 'consistent with' sexual abuse" are "proper" questions for experts and do not "inappropriately suggest[] to the jury what result to reach." *State v. Burnett*, 2018 UT App 80, ¶ 29, 427 P.3d 288 (cleaned up). And qualified expert witnesses may offer testimony about the potential causes of various types of injuries. *See Patey v. Lainhart*, 1999 UT 31, ¶ 22, 977 P.2d 1193 ("An expert opinion about the cause of an injury is admissible where the subject matter is not one of common observation or knowledge." (cleaned up)). Thus, adequately supported statements from a properly qualified expert witness that certain types of injuries are "consistent with" reports of nonconsensual contact and are "generally" not caused by "consensual intimacy" are proper. *See id.* ¶ 26 ("We held long ago that an expert may testify to 'what did' cause, as well as to 'what might' or 'what could' have caused, the damages claimed." (cleaned up)).

¶29　Thus, Counsel could have reasonably believed that there was nothing objectionable about the statement Durfee now challenges as improper. And he could have then reasonably determined not to object to it and, instead, chosen to clarify the statement on cross-examination. *See State v. Griffin*, 2015 UT 18, ¶ 42, 441 P.3d 1166 ("Utilizing cross-examination to expose defects in an expert's presentation can be a sound trial strategy."); *see also State v. Christensen*, 2016 UT App 225, ¶ 21, 387 P.3d 588 (concluding that an attorney had not performed deficiently when the attorney "could have reasonably decided to refrain from objecting to [a witness's] testimony so as to discredit it during cross-examination" instead). And here, Counsel did just that: during cross-examination of Expert, Counsel asked, "You aren't able to exclude the possibility that these injuries are the result of consensual sex, are you?" And Expert responded, "Is . . . injury possible in consensual sex? I'm sure it probably is." This strategy enabled Counsel to clarify with Expert that Eliza's injuries could have potentially occurred from consensual sexual activity, without also drawing further attention to Expert's testimony that these sorts of injuries "generally" do not occur from consensual sexual encounters.

¶30　In sum, it was reasonable for Counsel to have interpreted Expert's testimony as proper, and it was appropriate to address such testimony during cross-examination instead of objecting to it during direct examination. Accordingly, Counsel did not render deficient performance, and Durfee's ineffective assistance claim therefore fails.

## II. Character Evidence

¶31　Next, Durfee challenges the court's evidentiary ruling in which it indicated that if Ex-Girlfriend testified about Durfee's character for respecting sexual partners' wishes, it would allow the State to ask her about an incident in which Durfee apparently did not leave Ex-Girlfriend's house upon request. We see no

reversible error in the court's ultimate ruling, but we take the opportunity to provide some guidance regarding the proper interpretation of the relevant rules of evidence.

¶32    Our rules of evidence place strict limitations on the introduction of character evidence into a trial. As a general matter, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in conformity with the character or trait." Utah R. Evid. 404(a)(1). But there are exceptions to this general rule, *see State v. Thompson*, 2014 UT App 14, ¶ 26, 318 P.3d 1221, and one of them involves situations in which defendants themselves wish to introduce evidence of their own character. In particular, "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." Utah R. Evid. 404(a)(2)(A).

¶33    When defendants elect to avail themselves of this option, rule 405 supplies the framework for how the character evidence is to be presented at trial. *See State v. White*, 2016 UT App 241, ¶ 27, 391 P.3d 311 ("Courts use rule 404 to determine when character evidence is admissible and rule 405 to determine how that evidence is to be admitted."); *see also Thompson*, 2014 UT App 14, ¶ 26 ("If character evidence is admissible under one of the exceptions" in rule 404(a), then "the methods of proving [such] character are limited by rule[] 405."). Thus, in several ways, rule 405 "limits the permissible methods of proof" of character. *United States v. Yazzie*, 188 F.3d 1178, 1189 (10th Cir. 1999) (applying rule 405 of the Federal Rules of Evidence).[5]

---

5. Rule 405 of the Utah Rules of Evidence follows rule 405 of the Federal Rules of Evidence "verbatim." *See* Utah R. Evid. 405 advisory committee note. And because "we generally seek to achieve uniformity" between identical rules, we "look to the

(continued…)

¶34    Under rule 405, the defendant who is offering the character evidence may present that evidence in one of two ways: "by testimony about the person's reputation or by testimony in the form of an opinion." Utah R. Evid. 405(a). Reputation evidence and opinion evidence are related, but they are not the same thing, and they present different options for a proponent of character evidence. As we recently stated, reputation evidence "speaks to what others think," while opinion testimony "speaks to what this witness thinks." *State v. Francis*, 2025 UT App 104, ¶ 88, 575 P.3d 1197. A defendant may opt to present reputation evidence from a witness who has "such acquaintance with the defendant, the community in which [the defendant] has lived and the circles in which [the defendant] has moved, as to speak with authority of the terms in which generally [the defendant] is regarded." *Michelson v. United States*, 335 U.S. 469, 478 (1948). Alternatively, a defendant may opt to present opinion testimony from a witness who might not be qualified to speak to the defendant's general reputation in the community but who "is sufficiently familiar with the person characterized so that the witness may form an opinion that will be helpful to the trier of fact." R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 273 (2021–22 ed.). Either of these options is open to defendants who wish to present evidence of their own character.

¶35    But it is worth noting that those are the only two options, and that each of these options, properly exercised, necessarily involves only a rather brief presentation on the part of the proponent of the evidence. A reputation witness may testify that the defendant is well-known in the community for a particular character trait. An opinion witness may testify that, in her opinion, the defendant possesses a particular character trait. But

interpretations of the federal rules by the federal courts to aid in interpreting the Utah rules." *State v. Johnson*, 2022 UT 14, ¶ 22, 508 P.3d 100 (cleaned up).

unless rule 405(b) applies—and it doesn't apply here[6]—neither reputation nor opinion witnesses may elaborate on their testimony by offering evidence, during direct examination, about specific instances of the defendant's conduct. *See State v. Leber*, 2009 UT 59, ¶ 22, 216 P.3d 964 ("[R]eputation and opinion witnesses may not be asked about specific instances of conduct on direct examination under rule 405(a).").

¶36    In the rule 405(a) context, it is only on *cross-examination* of the reputation or opinion witness that specific instances of the defendant's conduct may be inquired about. *See* Utah R. Evid. 405(a) ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."). But even here, the inquiry must stop at simple questioning of the witness; the cross-examiner may not present extrinsic evidence of specific instances of the defendant's conduct. *See State v. Lenaburg*, 781 P.2d 432, 437 (Utah 1989) (stating that, when defendants present evidence of their own character, "[t]he prosecution can inquire as to specific instances of conduct on cross-examination . . . , but neither rule 405 nor rule 608 permits the prosecution to call witnesses in rebuttal to testify as to alleged specific instances of conduct of a defendant"), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997); *see also United States v. Hazelwood*, 979 F.3d 398, 410 (6th Cir. 2020) ("A party may only inquire about specific instances of the person's conduct, without introducing extrinsic evidence of that conduct." (cleaned up)); *United States v. Benedetto*, 571 F.2d 1246, 1250 (2d Cir. 1978) ("While a character witness may be asked on cross-examination about specific instances of conduct, such acts may not be proved by extrinsic evidence . . . ." (cleaned up)).

---

6. Rule 405(b) states that, "[w]hen a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct."

¶37     Thus, the trial court was not entirely correct when it stated that, if Durfee presented evidence of his own "pertinent character traits" through evidence of specific conduct, then the State would get to rebut that testimony through evidence of specific conduct. The court correctly noted that the State would get to cross-examine Durfee's character witness by inquiring about specific instances of Durfee's conduct. But the court was off-base when it indicated that Durfee, on direct examination of his character witness, would be allowed to offer evidence of specific instances of his own conduct. In that situation, Durfee could only offer evidence of his general reputation in the community or the particular witness's opinion about his character.

¶38     But despite this inaccuracy, we discern no error or abuse of discretion in the trial court's ultimate ruling. The crux of the matter is whether the court erred in determining that, in cross-examining Durfee's character witness—Ex-Girlfriend—the State would be permitted to ask her about one specific instance of Durfee's conduct: an occasion in which he apparently refused to leave her house upon being asked to do so. And *that* question turns on whether the instance in question—Durfee's refusal to accede to the request to leave the house—is a *relevant* specific instance of Durfee's conduct. *See* Utah R. Evid. 405(a) (stating that, on cross-examination, the other party may ask about "*relevant* specific instances of the person's conduct" (emphasis added)).

¶39     In making this assessment, we are guided by the definition of relevance provided in our related rules of evidence, namely, that evidence is "relevant" if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *See id.* R. 401. "The bar for relevance is very low, and even evidence with the slightest probative value is relevant." *State v. Blackwing*, 2025 UT 60, ¶ 36, 582 P.3d 829 (cleaned up). And to meet that low bar, "evidence need not directly prove or disprove the fact of consequence." *Id.* ¶ 37. Indeed, "only a logical connection

between the evidence and the fact of consequence is required, and that connection to an element need not be direct, so long as it exists." *Id.* (cleaned up).

¶40   In this case, the trial court did not exceed its discretion by determining that evidence that Durfee refused to leave Ex-Girlfriend's house upon request would have been relevant to assessing the credibility and weight of Ex-Girlfriend's proffered testimony that, in her opinion, Durfee was "considerate" and was the sort of person who respected his sexual partner's wishes during intimacy. In our view, a factfinder could reasonably conclude that because Durfee refused to leave Ex-Girlfriend's house on one occasion when asked, he was less likely to be a considerate person who respected sexual requests from a romantic partner. We acknowledge Durfee's point that the two requests are not identical and that there may be a basis upon which to differentiate between a person's propensity for acceding to sexual requests and that same person's propensity for acceding to requests to leave a residence. But the differences between these types of requests are not so great as to render irrelevant Durfee's refusal to leave the house; indeed, we acknowledge the State's point, made during argument before the trial court, that a person's home and a person's body are both intensely personal spaces. They certainly share sufficient similarities for a juror to reasonably conclude that Durfee's apparent refusal to leave Ex-Girlfriend's house upon request would make it somewhat less likely that he is the sort of person who strictly respects his lover's wishes during intimacy. At least, we cannot say that the trial court's determination exceeded its discretion in this context.

¶41   Accordingly, we reject Durfee's challenge to the trial court's evidentiary ruling provisionally allowing the State to ask Ex-Girlfriend, on cross-examination, about the specific instance of conduct in which Durfee apparently refused to leave her house upon request.

CONCLUSION

¶42    Durfee's ineffective assistance claim fails because he has not demonstrated that Counsel performed deficiently in the manner in which he handled and responded to Expert's testimony about Eliza's injuries. And we reject Durfee's challenge to the trial court's evidentiary ruling regarding the permissible scope of the State's cross-examination of Ex-Girlfriend. For these reasons, we reject Durfee's appellate arguments and affirm his conviction.

———————