**2025 UT App 104**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
REX ALLEN FRANCIS,
Appellant.

Opinion
No. 20220669-CA
Filed July 10, 2025

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 191911719

Nathalie S. Skibine and Hillary King,
Attorneys for Appellant

Derek E. Brown, Tera J. Peterson, Tanner Hafen, and
Emily Sopp, Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

TENNEY, Judge:

¶1    Rex Francis was charged with several criminal offenses involving the alleged sexual abuse of two teenaged girls. At the close of trial, the jury convicted him of two counts of forcible sexual abuse and one count of object rape, but it acquitted him of three other counts. Francis now appeals his convictions on several grounds.

- First, Francis argues that the district court abused its discretion when it allowed an expert to testify about common behaviors and characteristics of sexual assault victims.

- Second, Francis argues that the court erred when it sustained an objection to a question that asked a witness to give her opinion about the character for truthfulness of one of the victims.

- Third, Francis argues that the court erred when it declined to instruct the jury on a proposed lesser included offense.

- Fourth, Francis argues that the court erred when it declined to give the jury a proposed unanimity instruction.

- Finally, Francis asks us to reverse under the cumulative error doctrine.

¶2 As explained below, we see no error relating to the expert testimony issue or the unanimity issue. While we do believe that the court erred with respect to the other issues, we conclude that Francis was not harmed by the errors, either individually or cumulatively. We therefore affirm Francis's convictions.

BACKGROUND[1]

¶3 This case involves Francis's alleged sexual abuse of two victims: Alice and Lacy.[2]

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Cesspooch*, 2024 UT App 15, n.1, 544 P.3d 1046 (quotation simplified), *cert. denied*, 550 P.3d 994 (Utah 2024). As discussed below, each victim in this case alleged that Francis sexually abused her on many occasions, and a jury later convicted Francis on some—though not all—of the charged offenses.

2. Both are pseudonyms.

*Alice*

¶4     Alice was raised by her father and her stepmother (Stepmother). Stepmother has "been in [Alice's] life since" she was "about 2," and Alice considered Stepmother to be the "only mother figure" she ever really had.

¶5     Alice had known Francis since she was about two years old. At trial, Stepmother testified that Francis was her "biological brother," though Alice testified that she thought Francis was actually Stepmother's "half" brother. Regardless, Alice considered Francis to be her "uncle."

¶6     Francis "had a drug problem over the years," and Stepmother's home was something of a "safe home" for him. While Alice was growing up, Stepmother would sometimes let Francis "crash a couple nights" there. In July 2013, when Alice was about 14 years old, Francis moved in with the family full-time, and he lived there for about the next two years. Francis slept in the basement living room, which was just a few feet from Alice's room.

¶7     Alice was introduced to drugs by her biological mother at a young age, and Alice continued to use drugs after her biological mother passed away (which was around the time that Alice was 11). When Francis moved into the home, Alice told him about her drug use, and she then used drugs with him on many occasions. Francis sometimes gave Alice pills, which the two "usually crushed up" and "snort[ed]," and although Alice sometimes did not know for sure what the pills were, she "believed" that they were "meth" the "majority of time." Francis also taught Alice how to use a canned air duster for "huffing."

¶8     At trial, Alice testified that Francis touched her in a sexual manner "[m]ultiple times" during the two years that he lived with her family. Alice said that Francis touched her vagina "about 20 times" during those years, sometimes over her clothing and

sometimes under her clothing. She said that "[a] lot of the time," he would start touching her while she "was asleep," and that on other occasions, he would touch her after she had taken drugs and was "high as a kite," at which point Francis would "kind of just go for it" without "necessarily ask[ing] or anything."

¶9    Alice also claimed that on two occasions, Francis had sexual intercourse with her. She said that on one of those occasions, Francis did so even though she told him "no," and she said that on the other occasion, Francis had sex with her while she was passed out.[3]

¶10    Alice said that Francis stopped touching her when she was 16 after she had threatened to tell her father about what was happening. Alice said that Francis told her that he would stop only if she sent him nude pictures so that he could "get . . . his fix," and she also said that she complied because "[i]t got him to stop touching [her] physically, and that's all [she] wanted."

*Lacy*

¶11    Lacy has been friends with Alice since Lacy was around 12 years old. Francis is a close friend of Lacy's father, and he had also been friends with Lacy's family for years. Francis lived with Lacy's family several times, and Lacy later testified that Francis "constantly kind of moved in and out." Lacy was 11 or 12 the first time Francis lived with her family, and she was about 15 or 16 the last time he lived with them. Francis was in his mid-30s during those years. Lacy later said that she "consider[ed] him" to be her "uncle, because he was a part of the family for so long."

¶12    When Lacy was nine, Francis gave her alcohol for the first time. During the ensuing years, he gave her an assortment of

---

3. As will be noted below, the jury later acquitted Francis of both charges relating to alleged sexual intercourse with Alice.

drugs, including "[a]ir duster, meth, pot, marijuana, . . . cigarettes, pills, [and] Valium."

¶13    When Lacy was around 12, she started sleeping on a couch in the living room of her family home, and although Francis had a bedroom downstairs, he would often sleep on another couch in the same room that Lacy slept in.

¶14    Francis sometimes said things to Lacy that made her "uncomfortable," such as that she was "sexy." Lacy testified at trial that on several occasions, she woke up in the middle of the night to find Francis touching her vagina, both over and under her clothes. Lacy estimated that the first time this happened was when she was around 12 or 13, and she said that it happened "[a]t least" 10 to 15 times. Lacy also said that, beginning when she was 14 or 15, Francis would sometimes touch her vagina with a "vibrator" or a "dildo."

¶15    At one point, Francis used spray paint to write words on the wall of the garage at Lacy's home that used her nickname and said, "[Nickname] is way more sweet than N.E. I love her more than I should."[4]

---

4. At trial, the State introduced a photograph that Lacy had taken of this writing, and Lacy testified that this writing stayed on her family's garage wall for "[q]uite a few years." Lacy acknowledged that she wasn't sure that Francis actually wrote it, though she believed that Francis did. One of the detectives who investigated the case testified that when he showed Francis a picture of the spray-painted writing and asked him about it, Francis admitted that it was his handwriting, though Francis claimed that he didn't remember writing it. On appeal, Francis notes that some testimony at trial suggested that one of Francis's ex-girlfriends had a name that was similar to Lacy's—from this, he suggests that the nickname could have conceivably referred to his ex-girlfriend,

(continued…)

¶16    When Lacy was 16, she told Francis that he had to stop touching her, and he did. About a year after he stopped, Lacy told her friend Alice that Francis had sexually touched her.

*Police Interview*

¶17    In June 2018, Alice told Stepmother about the abuse, and Stepmother then called the police. In November 2019, Lacy informed the police that Francis had abused her as well.

¶18    During a subsequent interview with detectives, Francis denied that he had sexually touched Alice or Lacy. But Francis admitted that his relationships with both of them were "not appropriate" and that he "shouldn't have friends that young." He also admitted that he had been "around" Alice and Lacy "while they were doing drugs" and "using alcohol," though he denied giving drugs to Alice.[5] Francis also told detectives that Alice had "come on to him."

*Charges and Trial*

¶19    In November 2019, Francis was charged with one count of rape (Alice), three counts of forcible sexual abuse (Alice), one

---

not Lacy. But viewing the evidence in the light most favorable to the verdict, we believe that the testimony from Lacy and the detective supported the conclusions that Francis wrote this and that it was about Lacy.

　　　Finally, we see no explanation in the record, and the parties have given us none in the briefs, for who "N.E." may have been. But for purposes of this case, what matters is the suggestion that the nickname could—and, as explained, likely did—refer to Lacy.

5. Francis did not testify at trial, so the account of this interview came from the detectives. Neither detective addressed whether Francis made a similar denial about having given drugs to Lacy.

count of object rape (Lacy), and one count of sexual abuse of a child (Lacy).[6]

¶20 The case went to trial in April 2022. The State called Alice and Lacy, who testified to the events detailed above. The State also called the two detectives who had investigated the case, and they recounted the statements Francis had made to them during his interview.

¶21 In addition to the above witnesses, the State called two witnesses whose testimonies are central to issues raised on appeal: an expert witness (Expert) and Stepmother.

*Expert's Testimony*

¶22 Before trial, the State provided notice that it intended to call Expert to testify about "(1) the neurobiology of trauma/trauma response, (2) common short-term behaviors of people who have experienced trauma, and (3) counter-intuitive behavior of sexual assault victims." Francis objected under rules 702 and 403 of the Utah Rules of Evidence.

¶23 In October 2021, the district court held a pretrial hearing to determine whether Expert's proposed testimony would be admitted. At that hearing, Expert testified about his qualifications. He explained that he has a master's degree in educational psychology and a doctorate in "counselor education and supervision." He said that he currently worked as an assistant professor, where he taught graduate-level courses on sexual assault and trauma. Separate from his work as a professor, Expert said that he had worked as a mental health counselor for the past 22 years, during which time he commonly worked with "survivors of sexual violence." In addition, Expert said that he had previously worked for about 10 years for a rape recovery

---

6. The State also charged Francis with one count of lewdness relating to Alice, but the State dismissed that charge before trial.

center as a victim advocate, during which time he worked with 300 to 400 "victims or reporting victims" of "sexual violence."

¶24 Expert testified that he "stay[s] current on the literature related to counselor education," "clinical work," and sexual assault. Expert testified that he is a member of a national association relating to the treatment of survivors of sexual abuse, that he attends its national and local conferences, and that he "read[s] the literature about sexual violence in general" that he receives through that association. Expert said that he was also currently serving as the chair of a local board of nurses who provide "forensic exams to alleged victims of sexual violence," and that as part of that work, he receives and reviews "current journal articles about sexual violence." Expert testified that he has "trained others about the neurobiology of trauma," and he explained that when he prepares these trainings, he relies on his "clinical experience," the "experience[s] of other healthcare professionals," and "a range of books and journal articles" relating to these issues.

¶25 During his direct examination by the State, Expert stated that his opinions about the common responses and behaviors of sexual assault victims were drawn from both his professional experiences and his review of the relevant studies and literature. He reiterated this during cross-examination. At one point, for example, defense counsel asked, "[Y]ou're basing your opinions and your testimony on your experience as a—a therapist and a counselor, as well as research that you read to stay up on the literature; is that right?" Expert replied, "I would say there are three types of experience[s] that I've had, and this is mostly a yes, so my experience as a victim advocate for 10 years, my experience as a clinician, and indeed, my experience as an instructor—as a university instructor, in which I've—I've had to maintain currency on the literature." All in all, Expert testified that he was "quite confident" that his opinions about issues relating to sexual assault survivors were "well within the mainstream of common

beliefs" and "commonly held understandings" by "experts in the field."

¶26 After hearing Expert's testimony and receiving written and oral arguments from the parties, the district court ruled that Expert was qualified and that his testimony was admissible under rule 702. The court concluded that Expert was "qualified by experience, his training and expertise," and it further ruled that Expert's testimony seemed "to be based upon peer-reviewed studies" and seemed "to be generally accepted by the relevant expert . . . community." The court also rejected Francis's rule 403 challenge, concluding that Expert's testimony was "certainly relevant" and that it was not "unfairly. . . prejudicial," given that "the wide range of information" that Expert would be presenting did not, in the court's view, "focus on the idea of truthfulness." But the court cautioned the State that it would not allow Expert to testify at trial about particular percentages associated with false reporting, and the court said that if Expert offered such testimony and the defense objected, it would sustain the objection.

¶27 The State later called Expert as a witness at the trial. At the outset of his testimony, Expert briefly set forth his qualifications, including his years of experience working as a victim advocate at a rape recovery center, his years treating survivors of sexual violence, and his years of teaching. Expert then informed jurors that he did not know any of the people involved in this case, that he had not read any reports about it, and that he did not know the facts of the case. Expert explained that he was "[a]bsolutely not" there to "give an . . . opinion about the facts of this case."

¶28 The State then asked Expert to testify about the realities behind several "rape myths." Expert identified several such "myths," including that "rapes tend to be perpetrated by strangers, that they tend to be violent, victims tend to resist, fight back, they're often injured in the process, victims are hysterical, highly emotional after an assault, [and] it's common for victims to

report immediately after" a sexual assault. In response to questioning from the State, Expert testified that "most of the time[,] rapes are perpetrated by someone the victim knows." Expert also explained that while it is sometimes assumed that rape victims react "hysterically," there is actually "a broad range of ways in which people respond to sexual violence." Expert testified that "[i]f there is one commonality that might describe all or nearly all victims," it's that victims have a "tendency to blame [themselves] for what happened." Expert said that it's "not uncommon" for victims to delay reporting or even not report at all and that "shame" and "guilt" are some of the "reason[s] that not everyone reports." And Expert also said that it's "common" for victims to "initially question whether something was a sexual assault." As one example of what might prompt a victim to blame themselves, he pointed to situations in which "drugs or alcohol" were "involved."

¶29　In the course of his direct examination by the State, the following exchange occurred:

> State: Do—do people who have been sexually assaulted usually immediately get medical attention?
>
> Expert: No.
>
> State: Some—I assume some do.
>
> Expert: Some do. I mean, I have a—so of those that report, about a third do so within a few days, a third do so within weeks, and a third may not do so for a much longer period of time.
>
> State: Do some people never report to police?
>
> Expert: Absolutely. That's also not uncommon.

¶30    In various portions of his testimony, Expert clarified whether he was drawing a particular opinion from his own professional experiences or instead the relevant literature. At one point in his testimony, for example, Expert observed that delayed reporting was "the norm." He then added, "I do want to hasten to add that this is based on clinical experience, and not things that I've read in the literature," and he further specified that his reference to "clinical experience" meant patients whom he had counseled in his own practice. As another example, Expert admitted during cross-examination that the research regarding sexual violence can be limited because the data can only be observational, rather than obtained through controlled experiments. But he then insisted that "the reason" he had

> a degree of confidence—a relatively high degree, is that survivors have been studied for many years by many different people in many different settings. By that, I mean, universities, different settings, different countries, Scandinavia, UK, Australia, Israel, so on and so forth, and because there's a marked similarity in the findings, I think it lends—lends confidence to what we believe we know about sexual assault survivors.

*Stepmother's Testimony*

¶31    The State also called Stepmother as a witness at trial. During her direct examination, she recounted the conversation she had with Alice in June 2018 in which Alice told her about the alleged abuse.

¶32    During cross-examination, defense counsel asked Stepmother a series of questions about Alice more generally. Stepmother testified that Alice was a difficult teen, describing Alice's teenage years as "[t]raumatizing" with "[l]ots of drama." She also testified that, starting in junior high, Alice would drink,

smoke, and do drugs. Stepmother stated that Alice "kept a lot of secrets" as a teenager, specifically related to her drinking habits.

¶33    During this questioning, the following exchange occurred:

> Defense counsel: Okay. So based on you knowing [Alice] for nearly her whole life, does she have a reputation for being untruthful?
>
> Stepmother: Yes.
>
> Defense counsel: Okay.
>
> Stepmother: Well, I—
>
> Defense counsel: So just try to only respond if there's a question.
>
> Stepmother: Sorry.

Defense counsel then asked Stepmother, "[H]ave you formed an opinion about whether [Alice is] truthful or untruthful?" The State objected, arguing that the question called for "improper character evidence."

¶34    The court excused the jury, and the parties then addressed the merits of the State's objection. Defense counsel argued that the question "falls squarely under [rule] 608." This was an apparent reference to rule 608(a) of the Utah Rules of Evidence, which states that a "witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." In defense counsel's view, this rule allows both "reputation and opinion," "reputation is different than opinion," and since the initial question had asked Stepmother for reputation testimony, the follow-up question was now appropriately asking for Stepmother's opinion as well. In

response, the prosecutor argued that the defense had already established "very many things" about Alice's "childhood" and "character as a teenager." The prosecutor then said, "In addition to a concern about—under 608, I've also got a 403 concern." The prosecutor explained that he had previously spoken with Stepmother, and he told the court that he was concerned that her answer to the pending question might involve certain "conspiracies" about her views of the case, so he thought that allowing her to answer it would "run a . . . severe 403 risk."

¶35     After some additional argument, the court sustained the objection, telling defense counsel, "I believe that you've asked the question and you received the answer."

*Jury Instructions*

¶36     Before trial, defense counsel submitted proposed jury instructions. These included both unanimity instructions and several lesser included offense instructions relating to the various charges.

¶37     **Unanimity instructions.** The unanimity instructions proposed by Francis related to counts two through five of the information, which were the three counts of forcible sexual abuse relating to Alice and the object rape count relating to Lacy. During a midtrial recess, the parties discussed jury instructions with the court. In this discussion, defense counsel brought up the proposed unanimity instructions, and she asked the court to instruct jurors that they must be unanimous about (1) which "specific act" comprised which conviction, and (2) which particular "theory of consent or nonconsent" related to those acts. After some back and forth about the proposed unanimity instructions, the court asked the parties to confer and come back with "the thing" they "really" needed the court "to decide."

¶38     The parties then had an off-the-record discussion, and when they returned, defense counsel informed the court, "I think

we've resolved a lot in terms of making some slight changes to the elements so there's fewer alternatives, which . . . I think, takes care of most of the . . . special verdict form . . . and unanimity." Defense counsel also said, "I think the only issue left from my perspective is unanimity as it relates to theories of consent." Defense counsel then argued that jurors should "have to be unanimous as to that theory of consent" and "that they should identify it on a special verdict form." The State disagreed, arguing that while jurors do "need to be unanimous that there was no consent," "[n]othing in . . . [the] caselaw suggest[s] that they have to be . . . unanimous" about which theory of nonconsent applied to any particular charge. The district court agreed with the State and concluded that the unanimity rule "has some limitations, and it certainly isn't as broad as the defense is suggesting it should be."

¶39    **Lesser included offenses relating to Alice.** During this same midtrial discussion, the parties also discussed the lesser included offense instructions that Francis had proposed.

¶40    Of note for this appeal, these included a proposed lesser included offense for the three counts of forcible sexual abuse relating to Alice. By way of background, these offenses required the State to prove that Francis acted "without [Alice's] consent." Utah Code § 76-5-404(2)(a)(i).[7] A statute provides a list of "circumstances" under which a sexual act done "is without consent," and one of them is that the defendant "occupied a position of special trust in relation to the victim" who is younger than 18. *Id.* § 76-5-406(2)(j). "Position of special trust," in turn, is statutorily defined in several ways, including "an uncle" and a "cohabitant of a parent if the cohabitant is an adult." *Id.* § 76-5-404.1(1)(a)(iv)(F), (U). In advance of trial, the State indicated that

---

7. Many of the statutes cited in this portion of this opinion have since been amended, but because there have been no material changes to the statutory language in question, we cite the current versions for convenience.

one of the ways it intended to try proving that Alice did not consent was that Francis "occupied a position of special trust" over her, and the State further indicated that it would seek to prove this by showing that he was either her "uncle" or a "cohabitant" of one of her parents. The State also indicated that it would argue other theories of nonconsent provided in the statute, including that: Alice expressed "lack of consent through words or conduct"; Alice was "unconscious, unaware that the act was occurring, or was physically unable to resist"; Francis "overcame" Alice through either "physical force or violence," or "concealment or the element of surprise"; and Francis was "more than three years older than" Alice, Alice was between 14 and 18 years old, and Francis "enticed or coerced" her "to submit or participate." *See id.* § 76-5-406(2)(a), (b), (c), (e), (k).

¶41 As noted, defense counsel submitted proposed jury instructions before trial. For the forcible sexual abuse charges relating to Alice, defense counsel asked the court to give a lesser included offense instruction that would allow the jury to conclude that, rather than forcible sexual abuse, Francis had instead committed an act of unlawful sexual activity with a 16- or 17-year-old. Francis contended that such an instruction was warranted because, unlike forcible sexual abuse, the offense of unlawful sexual activity with a 16- or 17-year-old did not turn on a lack of consent.

¶42 During the midtrial discussion on jury instructions, the parties argued about whether the court should give this lesser included offense instruction. Francis argued that the instruction was warranted because the jury could rationally believe that Francis did not qualify as either Alice's uncle or a cohabitant of one of her parents. The prosecutor disagreed, arguing that there was no "factual" basis for the instruction "because everyone agrees that the defendant is her uncle," and the prosecutor further contended that Francis more broadly occupied a "position of special trust" in the various other ways proposed by the

prosecution. After the discussion, the court declined to give the instruction, ruling that Francis "[w]as a cohabitant" because he "lived with them on and off for periods of time," as well as because Alice "considered him to be a family member" (which, in context, seems to have been the court's acceptance of the State's theory that he qualified as her "uncle").

¶43     In the final jury instructions, the jury was instructed that the State could prove that Francis occupied a position of special trust, in part, if it showed that he was her "uncle" or "cohabitant of a parent." And the jury was also instructed on several other ways the State could prove nonconsent, including that Alice "expressed lack of consent through words or conduct"; that Francis "knew [Alice] was unconscious, unaware that the act was occurring, or was physically unable to resist"; and that Francis "enticed or coerced [Alice] to submit or participate." The instructions further informed jurors that they were "not limited" to those forms of nonconsent and that they could "apply the common, ordinary meaning of consent" to the facts of the case.

¶44     In its closing argument, the State asserted that Alice told Francis "no," and it further claimed that Francis "occupied a position of special trust in relation to her" because "[s]he knew him as her uncle." Alternatively, the State suggested that Francis was in "another position of special trust" because he was a "cohabitant" of Alice's parents. And the State further argued that Francis "enticed or coerced" Alice to participate when he "begged her" to have sex with him. Finally, the State reiterated that jurors were "not limited" to the listed theories of nonconsent and could "apply the common, ordinary meaning of consent."

*Verdict*

¶45     At the conclusion of trial, the jury convicted Francis of two counts of forcible sexual abuse (both relating to Alice—one count designated as "touch vagina over clothes," and the other designated as "touch vagina under clothes") and one count of

object rape (Lacy). The jury acquitted Francis of one count of forcible sexual abuse (relating to Alice, designated as "first time, touch vagina over clothes"), one count of rape (Alice), and one count of sexual abuse of a child (Lacy). Francis now appeals his convictions.

ISSUES AND STANDARDS OF REVIEW

¶46    Francis first argues that the district court should not have admitted Expert's testimony. "We review the admission of expert testimony under an abuse of discretion standard." *State v. Bowdrey*, 2024 UT App 113, ¶ 15, 555 P.3d 367 (quotation simplified), *cert. denied*, 561 P.3d 688 (Utah 2024).

¶47    Second, Francis argues that the court erred in sustaining the objection to defense counsel's question about Stepmother's opinion of Alice's character for truthfulness. A court's decision to exclude evidence is reviewed for an abuse of discretion. *See State v. Martin*, 2017 UT 63, ¶¶ 18–19, 423 P.3d 1254.

¶48    Third, Francis argues that the court erred when it declined to provide the jury with a lesser included offense instruction for the forcible sexual abuse counts relating to Alice. "A trial court's refusal to grant a lesser included offense instruction is a question of law, which we review for correctness." *State v. Reece*, 2015 UT 45, ¶ 16, 349 P.3d 712 (quotation simplified); *accord State v. Florez*, 2020 UT App 76, ¶ 15, 465 P.3d 307.

¶49    Fourth, Francis argues that the court erred when it declined to provide his requested unanimity instructions. As explained below, we conclude that Francis has waived part of his challenge. The other part of his challenge, however, turns on whether he was legally entitled to such instructions (as opposed to whether the facts would support them). We regard that challenge as implicating a question of law that we review for correctness. *See State v. Powell*, 2007 UT 9, ¶ 11, 154 P.3d 788 ("Because jury

instructions are statements of the law, we review challenges to jury instructions under a correctness standard." (quotation simplified)).

¶50 Finally, Francis asks us to reverse under the cumulative error doctrine. Under that doctrine, we "reverse only if the cumulative effect of multiple errors undermines our confidence that a fair trial was had." *State v. Suhail*, 2023 UT App 15, ¶ 76, 525 P.3d 550 (quotation simplified).

## ANALYSIS

### I. Expert Testimony

¶51 Over Francis's objection, the district court allowed Expert to testify about common "rape myths" and about common responses of sexual assault victims. Francis now challenges this testimony on two levels. First, he argues that Expert's testimony was not sufficiently reliable to be admissible under rule 702 of the Utah Rules of Evidence. Second, he argues that Expert's testimony violated rule 403 of the Utah Rules of Evidence because it was improperly based on "anecdotal statistical evidence." We disagree with both arguments.

#### A. Rule 702

¶52 Under rule 702(b) of the Utah Rules of Evidence, "[s]cientific, technical, or other specialized knowledge may serve as the basis for expert testimony only if there is a threshold showing that the principles or methods that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts." This "threshold showing . . . is satisfied if the underlying principles or methods, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community." Utah R. Evid. 702(c).

¶53 This rule requires the proponent "to make only a threshold showing of reliability. This threshold is not so rigorous as to be satisfied only by methodology or data that are free of controversy." *California College Inc. v. UCN Inc.*, 2019 UT App 39, ¶ 22, 440 P.3d 825 (quotation simplified). When presented with such a challenge, district courts "act as gatekeepers to screen out unreliable expert testimony." *Id.* ¶ 23 (quotation simplified). "This function is limited to ensuring a minimal threshold of reliability for the knowledge that serves as the basis of an expert's opinion and must not displace the province of the factfinder to weigh the evidence." *State v. Wall*, 2020 UT App 36, ¶ 71, 460 P.3d 1058 (quotation simplified). While "the line between assessing reliability and weighing evidence can be elusive, appellate courts must be mindful of this important distinction because the factfinder bears the ultimate responsibility for evaluating the accuracy, reliability, and weight of the testimony." *Id.* (quotation simplified).

¶54 "District courts have wide discretion in determining the admissibility of expert testimony." *State v. Aziz*, 2018 UT App 14, ¶ 28, 414 P.3d 1014 (quotation simplified). When a court's ruling on such an issue is challenged on appeal, "we disturb the district court's decision to [admit or] exclude expert testimony only when it exceeds the limits of reasonability." *State v. Sheehan*, 2012 UT App 62, ¶ 15, 273 P.3d 417 (quotation simplified); *see also State v. Maestas*, 2002 UT 123, ¶ 19, 63 P.3d 621.

¶55 Francis challenges the district court's reliability ruling on essentially three fronts. First, he argues that the State did not lay a sufficient foundation for Expert's opinions. Second, he argues that Expert's conclusions were not reliable enough on a general, substantive level. And third, he argues that Expert's testimony was not sufficiently reliable because Expert drew at least some of his conclusions from his own experiences as a clinician. We address each argument in turn.

¶56 First, contrary to Francis's assertions, the State did lay a sufficient foundation for Expert's conclusions, and it did so by pointing to both his background (including both his professional qualifications and his professional experience) as well as his professional familiarity with the relevant studies and literature. In terms of his background, Expert testified at the pretrial hearing that he has a master's degree in educational psychology and a doctorate in "counselor education and supervision"; that he worked as an assistant professor, where he taught graduate-level courses on sexual assault and trauma; that he has worked as a mental health counselor for over 20 years with an emphasis on "survivors of sexual violence"; that he had previously worked for about 10 years as a victim advocate for a rape recovery center, where he worked with 300 to 400 "victims or reporting victims" of "sexual violence"; that he served on a board of a nonprofit organization that provides forensic exams to alleged victims of sexual violence; and that he had received related trainings regarding survivors of sexual violence.

¶57 The State also laid a foundation by pointing to Expert's familiarity with the relevant literature. Expert testified that he "stay[s] current on the literature related to counselor education," "clinical work," and sexual assault. He explained that in conjunction with his membership in an association relating to sexual violence, he reads and reviews the relevant literature. Expert further testified that he has "trained others about the neurobiology of trauma," and he said that when preparing such trainings, he has relied on both his "clinical experience," the "experience[s] of other healthcare professionals," and "a range of books and journal articles" relating to such issues. Thus, from a foundation perspective, Expert's testimony satisfied rule 702's requirements.

¶58 Second, Francis challenges the general reliability of Expert's testimony about the "commonalities" associated with sexual assault victims—both in terms of their profiles and their

responses to the sexual assaults. But as the State correctly points out, Utah appellate courts have repeatedly affirmed the admission of testimony similar to Expert's. In *State v. Boyer*, for example, we held that a district court did not abuse its discretion when it concluded that an expert's testimony about common problems among child sexual abuse victims, including that they "commonly delay disclosing the abuse," was sufficiently reliable to be admitted under rule 702. 2020 UT App 23, ¶¶ 41–42, 46, 460 P.3d 569. In *State v. Martin*, our supreme court likewise saw no abuse of discretion when a district court held that an expert's testimony "regarding reasons why children will give differing disclosures of alleged abuse" could be admitted under rule 702. 2017 UT 63, ¶¶ 28–32, 423 P.3d 1254. And in *State v. Wright*, we suggested that testimony about "the general principle that delayed reporting is common" would not be problematic under rule 702. 2013 UT App 142, ¶¶ 35–36, 304 P.3d 887. From our review of the record, Expert's testimony was similar in kind to testimony that has repeatedly survived challenges such as this one.

¶59    Third, Francis takes issue with the fact that at least some of Expert's testimony was based on his own professional experiences. But the fact that an expert's testimony is based, in some measure, on his or her own experiences does not mean that it cannot pass the rule 702 reliability inquiry. In *Eskelson v. Davis Hospital & Medical Center*, our supreme court held that "[w]hat is required for a threshold showing of reliability will vary depending on the complexity of the particular case." 2010 UT 59, ¶ 15, 242 P.3d 762. And the supreme court further held that the expert testimony in question there could pass the rule 702 reliability threshold, even though it was solely based on the expert's personal experience in the relevant field. *See id.* We reached a similar conclusion last year in *State v. Bowdrey*, concluding that an officer could draw from his "extensive experience" observing drug transactions to testify, as an expert, about what was "common" in certain kinds of drug transactions.

2024 UT App 113, ¶¶ 13, 27–28, 555 P.3d 367, *cert. denied*, 561 P.3d 688 (Utah 2024). And we also reached a similar conclusion in *State v. Shepherd*, concluding that an expert could testify about "how sound travels over water" based on his experience as an officer in the Coast Guard and as a boating officer at Lake Powell. 2015 UT App 208, ¶¶ 30, 33, 357 P.3d 598. With respect to rule 702's reliability inquiry, we explained that because the expert was offering "experiential opinions," he did not need to "identify a particular methodology," but that he could instead testify based on his professional "experiences" and offer "opinions" that were "within the scope of his experience." *Id.* ¶¶ 34–35 (quotation simplified).

¶60  Indeed, in some cases, our courts have applied these principles to the very kind of testimony at issue here—testimony from an expert about commonalities in sexual assault victims. In *State v. Loose*, for example, our supreme court held (albeit while addressing a case decided under a previous version of the rule) that "the trial court did not err" in allowing a social worker to offer expert testimony that "he had seen some of the behaviors he saw in [the victim] in other children who had been sexually abused." 2000 UT 11, ¶ 11, 994 P.2d 1237. In *Boyer*, we affirmed the admission of testimony from a psychiatrist about "the behaviors and symptoms consistent with child sexual abuse victims," where that testimony was based on the expert's "thirty years of experience working with child abuse victims." 2020 UT App 23, ¶ 42. And in *Martin v. State*, we recently affirmed the admission of an "[e]xpert's testimony that, based on her experience," the victim's "symptoms were consistent with sexual abuse." 2024 UT App 89, ¶ 52, 552 P.3d 758, *cert. denied*, 561 P.3d 692 (Utah 2024).

¶61  We recognize that, pursuant to rule 403, there are some limitations on an expert's ability to offer anecdotal statistical evidence. We address Francis's rule 403 challenge in Part I(B). But for purposes of the rule 702 inquiry, we again emphasize that the

question is whether the testimony has passed a "minimal threshold of reliability" so as to allow "the factfinder to weigh the evidence." *Wall*, 2020 UT App 36, ¶ 71 (quotation simplified). Here, when Expert testified about his opinions, he was doing so well within the scope of the foundation the State had laid. To the extent that Expert's opinions were based on his professional training and review of the literature, the State laid an appropriate foundation, and Expert then offered opinions similar to those that have commonly passed the threshold reliability standard. To the extent that Expert's opinions were based on his own professional experience, the State likewise laid an appropriate foundation, and our law does not prevent Expert from then testifying as an expert based on his experience. While Francis now contends that some of Expert's opinions may have been flawed, such arguments largely go to weight, not admissibility. More to the point, in light of the deference given to district courts in this area, we are not persuaded that we can or should reverse the district court's decision to reject Francis's rule 702 challenge.

B.     Rule 403

¶62     Francis next argues that the district court should have excluded Expert's testimony under rule 403. In doing so, Francis points to a line of cases that, in his view, prohibits witnesses from using "anecdotal statistical evidence" to opine on a witness's credibility. In response, the State contends that the rule set forth in the cases is not as broad as Francis suggests. Given the disputes between the parties about the state of the law in this area, we think it helpful to survey the key cases relied on by the parties in their briefs. Having done so, we conclude that as the cases in this area have evolved, certain throughlines have emerged. Based on those throughlines, we see no abuse of discretion in the court's decision to admit Expert's testimony.

1.      Past Cases

¶63     The line of cases that Francis relies on starts with *State v. Rammel*, 721 P.2d 498 (Utah 1986). The State there had relied on testimony from an accomplice, even though the accomplice had initially denied any involvement in the crime. *Id.* at 499. At trial, a detective testified that it was not "unusual" for an accomplice to initially lie about his involvement, and the detective also opined that "no criminal suspect ever admitted 'right off the bat' to committing a crime." *Id.* at 500. The detective further indicated that his opinions were based on his "experience interviewing several hundred criminal suspects." *Id.* On appeal, our supreme court concluded that this testimony was inadmissible for several reasons, including that the "potential for prejudice substantially outweighed its probative value." *Id.* at 501. The court explained that as "probability evidence," the detective's testimony had "invite[d] the jury to focus upon a seemingly scientific, numerical conclusion rather than to analyze the evidence before it and decide where truth lies." *Id.*

¶64     Francis next points to *State v. Iorg*, 801 P.2d 938 (Utah Ct. App. 1990). *Iorg* was a child sexual abuse case, and a deputy testified at trial that "at least fifty percent" of the 30 abuse victims she had worked with had waited more than a year to report the abuse. *Id.* at 939. The prosecutor also questioned the deputy specifically about the victim in that case, asking, "The fact that [the victim] was age 14 and reported three incidents that occurred to her when she was age eleven, is this unusual from your experience as a deputy?" *Id.* at 940. The deputy responded, "No. It is not." *Id.* On appeal, we concluded that the deputy's testimony "had the same potential for prejudice as the testimony condemned in *Rammel*" because, as in *Rammel*, the deputy "used her 'anecdotal statistical experience' with late reporting in sexual abuse cases to conclude that late reporting does not mean a victim is not telling the truth." *Id.* at 941.

¶65 Francis also points to two other child sexual abuse cases: *State v. Wright*, 2013 UT App 142, 304 P.3d 887, and *State v. Burnett*, 2018 UT App 80, 427 P.3d 288. In *Wright*, a detective testified at trial about delayed reporting, stating, "I would be willing to say that at least a third of my cases . . . are victims where they have either become 18 and are [o]lder or they've endured the abuse living with the suspect without telling anyone for years." 2013 UT App 142, ¶ 5 (alterations in original). We determined that this testimony "went a step beyond recognition of the general principle that delayed reporting is common," though we ultimately held that it was not prejudicial to the defendant. *Id.* ¶¶ 36–37. In *Burnett*, the expert witness (who was a psychiatrist) "told the jury, at least four times, that it is only in a 'small percentage' of cases that children lie about sexual abuse." 2018 UT App 80, ¶¶ 7, 36. We concluded that, "even though [the expert] stopped short of offering an opinion that [the victim] herself was telling the truth, there is no question that, by presenting (and later, in closing argument, emphasizing) this testimony, the prosecution was clearly inviting the jury to draw inferences about [the victim's] credibility based upon [the expert's] past experience with other cases and studies." *Id.* ¶ 36 (quotation simplified).

¶66 In Francis's view, Expert's testimony about the various ways that sexual assault victims do or do not react was inadmissible under the principles set forth in these cases.

¶67 The State disagrees, pointing to several cases in which we held that some testimony of this sort had not crossed the line. For example, in the aforementioned *Burnett*, we also held that certain portions of the expert's testimony were admissible. We held that the expert could testify "that certain symptoms are more commonly associated with sexual abuse victims than with the population at large." *Id.* ¶ 30. We also held that testimony that "a victim's symptoms are 'consistent with' sexual abuse does not amount to inadmissible profiling evidence, because such evidence does not prove directly the ultimate legal conclusion that a

particular victim has been abused." *Id.* ¶ 27 (quotation simplified). And we further held that an expert may testify that some behaviors are "more common among sexually abused and traumatized children than among other children," as well as offer testimony that a particular behavior may be an "indicator" of abuse. *Id.* ¶ 28.

¶68 The State also points us to *Boyer*. There, we held that an expert could testify "about 'mental health problems, physical problems, [and] behavioral problems' that are common among child sexual abuse victims." 2020 UT App 23, ¶ 46 (alteration in original). We explained that this testimony did not violate the principles set forth in such cases as *Rammel* because the expert "did not speak in terms of probabilities or offer direct opinions on the truthfulness of the victim's allegations," and because the expert "did not seek to connect his testimony about the general behavioral characteristics of child victims of sexual abuse to the victim's specific conduct." *Id.* ¶ 47 (quotation simplified). We further stressed that the expert "did not address or opine, even hypothetically, whether the evidence presented regarding the victim and any physical or mental problems she may have suffered was indicative of abuse," but instead "confirmed that he had never met the victim and was not aware of any facts pertaining to her life or the allegations against" the defendant. *Id.*

¶69 Finally, the State points us to *State v. Christensen*, 2016 UT App 225, 387 P.3d 588. There, we held that an expert could testify that the "[v]ictim's symptoms were consistent with PTSD," particularly where the expert did not base that testimony on a "psychological profile" and did not reach "the ultimate legal conclusion that [the victim] was sexually assaulted." *Id.* ¶ 28.

2.    Governing Principles

¶70 From these and other cases, a few principles have emerged.

¶71    First, an expert cannot claim that he or she can tell true testimony from false testimony generally, nor can an expert say that he or she can tell whether a particular witness or victim was telling the truth. *See Rammel*, 721 P.2d at 501 ("Probabilities cannot conclusively establish that a single event did or did not occur and are particularly inappropriate when used to establish facts not susceptible to quantitative analysis, such as whether a particular individual is telling the truth at any given time." (quotation simplified)); *State v. Carrera*, 2022 UT App 100, ¶ 68, 517 P.3d 440 ("[W]e have classified as inadmissible any claims by experts that they know how to discern lies from truth, or that they have made an evidence-based determination that a witness was telling the truth."); *Burnett*, 2018 UT App 80, ¶ 25 ("While experts may use their expertise to help the factfinder understand issues at trial, experts cannot testify that a particular witness has or has not told the truth.").

¶72    Second, testimony is more likely to be admissible if the expert testifies as a blind witness. *See Boyer*, 2020 UT App 23, ¶ 47 (noting that the expert "had never met the victim and was not aware of any facts pertaining to her life or the allegations" against the defendant); *Christensen*, 2016 UT App 225, ¶ 28 (pointing out that the expert "acknowledged that [the victim] was not one of his patients and stated that his testimony was not a diagnosis"). One of the benefits of doing so—and, particularly, when the jury is informed that the expert does not know the facts of this case— is that this helps remove the perception that the expert is opining on the truthfulness of a particular witness or victim.

¶73    Third, an expert can testify about "common" symptoms or behaviors of sexual abuse victims. *See State v. Martin*, 2017 UT 63, ¶¶ 22, 32, 423 P.3d 1254 (affirming admission of expert testimony regarding "common behaviors . . . of children who have been abused"); *Burnett*, 2018 UT App 80, ¶ 30 ("[The expert's] testimony simply stated, in various ways, that certain symptoms are more commonly associated with sexual abuse victims than

with the population at large. This testimony was permissible."); *State v. Bair*, 2012 UT App 106, ¶ 47, 275 P.3d 1050 (permitting testimony that "victims often delay reporting" and explaining that Utah courts have recognized that "delayed discovery and reporting are common in child sexual abuse cases" (quotation simplified)). In this sense, testimony in this area is more likely to be admissible if the expert speaks in generalities.

¶74 Fourth, our courts have expressed hesitancy about allowing an expert to testify in terms of hard numbers and percentages. As recognized in the key cases, the problem with such testimony is that when the expert's opinions are expressed in such concrete terms, this increases the likelihood that a jury might conclude that the expert is suggesting that, as a scientific matter, it is possible to determine whether a particular witness was telling the truth. *See Rammel*, 721 P.2d at 500–01 (concluding that the testimony that it was not "unusual" for an accomplice to initially lie about his involvement was improper because it "invite[d] the jury to focus upon a seemingly scientific, numerical conclusion rather than to analyze the evidence before it and decide where truth lies"); *Burnett*, 2018 UT App 80, ¶ 43 ("[N]ot even properly qualified experts are permitted to offer statistical evidence, anecdotal or otherwise, that informs the jury, even indirectly, that a witness is more or less likely to be telling the truth on a particular occasion.").

¶75 But that said, our courts have not categorically prohibited an expert from ever relying on statistics, particularly when drawn from studies that have an adequate foundation. *See State v. Garcia-Cardiel*, 2024 UT App 174, ¶¶ 10, 22, 561 P.3d 692 (holding that an expert's testimony that "there is 'some research that suggests that 60 to 80 percent of all abuse is . . . not reported until adulthood'" was admissible, in part, because the "figure came not from his experience interviewing victims but from research he was familiar with as an expert in the field"), *cert. denied*, 564 P.3d 959 (Utah 2025). And again, we recognize that in the rule 403 context, the

ultimate question is one of *balancing*, and district courts are given discretion in how best to balance the competing interests in a given case. *See State v. Beverly*, 2018 UT 60, ¶ 56, 435 P.3d 160. So while it may be best for district courts to caution witnesses to avoid relying too heavily (or even at all) on concrete statistics, we see no support for an outright prohibition on an expert's reference to statistics if they are properly supported.

3.     Application

¶76     Against this backdrop, we decline to reverse the district court's decision to admit Expert's testimony in this case.

¶77     As an initial matter, we note that Expert never claimed that he had any opinion about whether either of the two alleged victims were or were not telling the truth. To the contrary, Expert stressed to the jury that he was testifying as a blind witness—he testified that he had not "reviewed any reports for this case," that he had not received any information about the alleged victims or Francis, and that he did not even know what the charges were. He also testified that, "as a generalist," he was not trained to ascertain the veracity of alleged victims or whether a crime had occurred, and he further said that he would not attempt to do so in his testimony.

¶78     Francis nevertheless points to a number of particular statements made by Expert that, in Francis's view, were problematic. But in our view, none of the identified statements were so problematic that the district court could not exercise its discretion and admit Expert's testimony.

¶79     For example, Francis complains about several instances in which Expert testified about trends relating to sexual assault victims. These included moments in which Expert testified about what is "common" or the "norm," as well as testimony about what happens "most of the time." But as discussed, experts can

testify about commonalities, so this kind of testimony did not run afoul of any prohibition relating to the rule in question.

¶80    Francis also points to various statements made by Expert that were drawn from Expert's professional experiences counseling patients. Francis claims that such statements should have been deemed inadmissible because they were "anecdotal" and "observational," which, in Francis's view, made them unreliable. But as explained, an expert can testify based on the expert's professional experiences, so nothing categorically precluded Expert from describing observations drawn from his own professional practice. To the extent that Francis deemed such testimony to be problematic, Francis could certainly have challenged it through cross-examination or contrary testimony from an expert of his own (had he chosen to call one).

¶81    Moreover, Expert also drew many of his observations and statistics from studies and literature. And again, Expert was qualified to do so, and the State also laid appropriate foundation for any testimony that was based on Expert's review of outside sources.

¶82    Finally, Francis points out that in some instances, Expert cited concrete statistics. But as noted, while Utah appellate decisions have expressed hesitancy about allowing experts to rely on concrete statistics, we don't understand there to be a rule categorically prohibiting every reference to any statistic. Here, Francis has not persuaded us that Expert's reference to concrete statistics (whether drawn from his own experiences or his review of the literature) was so pronounced that the jury must have drawn an inference that Expert was implicitly suggesting that these particular victims were telling the truth. And in light of that, Francis also has not persuaded us that Expert's reliance on statistics was so pronounced that the district court abused its discretion when, after conducting the rule 403 balancing, it concluded that Expert could offer such testimony.

¶83 For all these reasons, we are not persuaded that the district court abused its discretion when it rejected Francis's challenge to Expert's testimony under rule 403.

## II. Stepmother's Testimony

¶84 As discussed above, Stepmother testified on cross-examination that Alice had a "reputation for being untruthful." When defense counsel then asked whether she personally had "an opinion about" whether Alice is "truthful or untruthful," the State objected. As the parties argued the issue, the initial discussion focused on whether this extra question was permitted under rule 608(a) of the Utah Rules of Evidence. In the course of that discussion, the State additionally claimed that Stepmother's answer might implicate rule 403. The district court ultimately sustained the objection, telling defense counsel, "I believe that you've asked the question and you received the answer." On appeal, Francis contends that, based on the overall tenor of the discussion and the specific wording used by the district court, its decision to sustain the objection was based on rule 608(a), and Francis then challenges this conclusion. In response, the State contends that Francis was not entitled to obtain both opinion and reputation testimony. We agree with Francis's interpretation of this rule.[8]

---

8. On appeal, the State suggests the court's ruling was actually based on rule 403. We disagree. In the exchange in question, the prosecutor raised the possibility of a potential rule 403 problem based on other testimony that the prosecutor was worried Stepmother might give. But when the court sustained the objection, the court didn't point to that potential problem, much less invoke rule 403 and conduct the balancing that's contemplated by that rule. Rather, the court sustained the objection based on its conclusion that the defense had already

(continued…)

¶85 Under rule 608(a), a "witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, *or* by testimony in the form of an opinion about that character." (Emphasis added.) On its face, this rule states that a witness can testify about another person's reputation for truthfulness *or* give an opinion about that person's character for truthfulness. But contrary to what seems to have been the view of the court, we see nothing in this rule that limits a witness to just one or the other.

¶86 On the plain language of this rule, the key word is the conjunction "or." When confronted with questions about the meaning of the word "or," a variety of courts have recognized that while "or" can be used in an inclusive sense (A or B, or both), and it can also be used in an exclusive sense (A or B, but not both), the usual or most common meaning of the word is the inclusive one. *See, e.g.*, *Rush v. Kijakazi*, 65 F.4th 114, 120 (4th Cir. 2023); *Fortin v. Commissioner of Social Sec.*, 112 F.4th 411, 422 (6th Cir. 2024); *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015); *In re Estate of Dodge*, 685 P.2d 260, 266 (Colo. App. 1984); *Fortune Ins. Co. v. Department of Ins.*, 664 So. 2d 312, 316 n.2 (Fla. Dist. Ct. App. 1995); *Ohio Patrolmen's Benevolent Ass'n v. Cleveland*, 244 N.E.3d 1092, 1096 (Ohio 2024). Commenters have recognized this too. *See, e.g.*, Bryan A. Garner, *Garner's Modern American Usage* 45 (3d ed. 2009) (observing that the inclusive sense "is the ordinary sense of the word"); Maurice B. Kirk, *Legal Drafting: The Ambiguity of "And" and "Or,"* 2 Tex. Tech L. Rev. 235, 243 (1971) (recognizing that "in

---

obtained the evidence it was entitled to obtain. While this ruling could perhaps be viewed as a more generalized "asked and answered" ruling, in light of the fact that the discussion had focused on rule 608, it seems to us that the court's ruling was based on the conclusion that the defense could not obtain both reputation and opinion testimony—and, thus, that because the defense had already obtained the former, it could not also obtain the latter.

most cases 'or' is used in the inclusive rather than in the exclusive sense" (quotation simplified)).

¶87   In determining whether an inclusive or an exclusive meaning was intended, certain linguistic cues may be helpful. As recognized by the Delaware Supreme Court, for example, if a statute or rule uses the word "either" in conjunction with the "or," this would set up an "'either/or' construct," and that construct is commonly understood to have an exclusive meaning; by contrast, "in ordinary English," the use of an "or" without the word "either" "often suggests the inclusive sense of 'or.'" *Gonzalez v. State*, 207 A.3d 147, 156 (Del. 2019). In other cases, substantive context may be helpful too. *See, e.g.*, *Rush*, 65 F.4th at 120 (concluding that "[w]ithout compelling context to the contrary," the inclusive application of "or" applied); *Fortin*, 112 F.4th at 422–23 (accepting the inclusive use of "or" given the context of the statute as a whole); *In re Estate of Dodge*, 685 P.2d at 266 (concluding that "the history and legislative intent behind" the statute suggested that the use of "or" should be given "its usual inclusive construction"); *Fortune Ins. Co.*, 664 So. 2d at 316 n.2 ("The word 'or' is used in the inclusive sense of 'A or B, or both,' unless the context affirmatively shows that it is used in the exclusive sense of 'A or B, but not both.'" (quotation simplified)).

¶88   In our view, rule 608(a) is most naturally read in the inclusive sense. Again, as recognized by cases and commenters, the more ordinary sense of the word "or" is the inclusive one, so that would be the natural starting place. And we also note that the rule does not contain the word "either," so it does not set up an exclusive "either/or" construct. Moreover, the substance of the rule suggests that it should be read inclusively. There's clearly some overlap between a person's reputation for truthfulness and a witness's opinion about that person's character for truthfulness. But however small it may be, we still see at least some daylight between these two things. A witness's testimony that "George has a reputation for being untruthful" could be at least somewhat

different from the same witness saying, "In my opinion, George is an untruthful person." The former speaks to what others think; the latter speaks to what this witness thinks. Given this, if the drafters of the rule had wanted to state that a witness could offer either reputation testimony or opinion testimony but not both, we would expect them to have provided some indication of this. We see no such indication.

¶89    This conclusion is reinforced by the context of the exchange in question here, which shows that defense counsel was indeed asking Stepmother for different testimony. Although Stepmother had testified that Alice had a "reputation for being untruthful," Stepmother had not given her own opinion about whether Alice had a character for being truthful or untruthful. In theory, those could have been different things. As a result, when the court ruled that defense counsel had already "asked the question" and "received the answer," the court was mistaken. Defense counsel had previously received an answer to a different question, but counsel had not received an answer that directly addressed this one. We therefore agree with Francis that the court should not have sustained the objection.

¶90    But even so, we are not persuaded that this error warrants reversal. This court "will reverse an erroneous evidentiary ruling only if, absent the error, there is a reasonable likelihood that there would have been a more favorable result for the defendant. A reasonable likelihood of a more favorable outcome exists when the appellate court's confidence in the verdict actually reached is undermined." *State v. Kohl*, 2000 UT 35, ¶ 17, 999 P.2d 7 (quotation simplified). As part of this analysis, we do our best to "determine from the record what evidence would have been before the jury absent the trial court's error." *Id.* (quotation simplified).

¶91    Here, Francis suggests that, given the other things that Stepmother said about Alice, it's likely that her response to the question at issue would have been that she had a negative opinion

about Alice's character for truthfulness. From the record, we agree with Francis that it's reasonable to assume that this would have been her answer. But for these very reasons, we also think that the jury would have likely already inferred that Stepmother's opinion of Alice's truthfulness wasn't positive. After all, the jury heard Stepmother's testimony about the same things that Francis is now pointing to—that Alice was a difficult teen, that Alice's teenage years were "[t]raumatizing" and characterized by "[l]ots of drama," that Alice had problems with drugs and alcohol, and that Alice "kept a lot of secrets," particularly relating to her drinking habits. And again, just moments earlier, the jury had heard Stepmother say that she thought Alice's reputation for truthfulness was poor. From all this, while we see at least some conceptual difference between the reputation question and the opinion question, we agree with the State that the jury likely already knew what Stepmother's opinion was about Alice's character for truthfulness. As a result, we agree with the State that the impact of the extra testimony that Stepmother should have been permitted to give would have been somewhat marginal.

¶92 Our conclusion that this was not prejudicial error is buttressed by other aspects of this case as well. Of particular note, Alice testified at length and was cross-examined by defense counsel. As a result, the perceived problems with her credibility were already highlighted for the jury, and the jury had the opportunity to evaluate her credibility in light of those arguments firsthand. We're not persuaded that this extra piece of information from Stepmother would have been so much more meaningful from what was already presented to the jury that it would have likely tipped the scales.

¶93 Moreover, Alice's claims were corroborated on at least some level by Francis's statements to the detectives. As noted, Francis admitted in his interview that his relationship with Alice was "not appropriate" and that he "shouldn't have [had] friends that young." And Francis also admitted that he was "around" her

"while they were doing drugs" and "using alcohol," which was a key part of her testimony about the circumstances surrounding the sexual abuse.

¶94    Finally, the charges relating to Alice were tried with the charges relating to Lacy, and Francis has not argued on appeal that the cases should have been severed. But the accounts from Alice and Lacy were similar in many respects. In each instance, Francis was a close family friend, the teenage girl regarded him as an "uncle," Francis stayed with the family for an extended period of time, Francis befriended the girl in what he agrees was an inappropriate way, Francis used drugs and alcohol with the girl, and Francis then allegedly touched her in sexual ways. While Stepmother could in theory have testified about her opinion of Alice's truthfulness, she was not asked a similar question about Lacy, so the missing testimony at issue would not have impacted Lacy's credibility in any way.[9]

---

9. Before trial, the State provided notice pursuant to rule 404(b) of the Utah Rules of Evidence that it intended to use the testimonies of Alice and Lacy together to prove Francis's "intent, knowledge, or recklessness about lack of consent." Having been so notified, Francis did not file an objection to this proposed use of their testimonies. As a result, during closing arguments, the State argued that the accounts were similar enough that they could each help prove the veracity of the other. By contrast, defense counsel argued during closing argument that the accounts were not sufficiently similar and were instead inconsistent.

On appeal, Francis has not argued that, under rule 404(b) or any other propensity related rule, the court should not have allowed the State to use these two accounts in this fashion. Against this backdrop, we think it appropriate to assume that the jury did indeed use the accounts together in the manner proposed by the State below.

¶95 In short, we agree that Stepmother should have been allowed to offer her opinion about Alice's character for truthfulness, but in light of the whole record, we're not persuaded that this extra testimony would have been significant enough to create a reasonable probability of a different result. We therefore reject this claim for lack of prejudice.

### III. Lesser Included Offense

¶96 As indicated, for the forcible sexual abuse charges relating to Alice, the State was required to prove that Francis acted without Alice's consent. Utah Code § 76-5-404(2)(a)(i). The State sought to prove this in a number of ways, including that Francis "occupied a position of special trust," and it sought to prove that he occupied a position of special trust in several ways, including that he was her "uncle" or "a cohabitant" of one of her parents. *See id.* § 76-5-406(2)(j); *id.* § 76-5-404.1(1)(a)(v)(F), (U). In advance of trial, Francis asserted that the jury could conclude that Francis did not qualify as either Alice's uncle or a cohabitant of one of her parents, so he requested a lesser included offense instruction to allow the jury to consider whether, rather than forcible sexual abuse, Francis had instead committed unlawful sexual activity with a 16- or 17-year-old, a crime that did not require proof of nonconsent. The court declined to give the proposed instruction.

¶97 On appeal, Francis argues that this was error. In response, the State argues that Francis was not entitled to the proposed instruction because the "evidence presented at trial unambiguously showed Francis occupied a position of special trust in relation to Alice, whether as her uncle, a cohabitant of her parents, or in some other capacity that allowed him 'to exercise undue influence over' Alice." (Quoting *id.* § 76-5-404.1(1)(a)(v)(W).) We agree with Francis.

¶98 Under Utah Code section 76-1-402(4), a defendant is entitled to a lesser included offense instruction when "there is a rational basis for a verdict acquitting the defendant of the offense

charged and convicting him of the included offense." In making this determination, a district court must "view[] the evidence in the light most favorable to the defendant requesting the instruction." *State v. Powell*, 2007 UT 9, ¶ 27, 154 P.3d 788; *see also State v. Reece*, 2015 UT 45, ¶ 22, 349 P.3d 712; *State v. Nelson*, 2021 UT App 26, ¶ 21, 484 P.3d 409.

¶99 The arguments below and again on appeal have focused on the "uncle" and "cohabitant" options, so we'll focus there too. In our view, a jury could rationally believe that although Francis had a close relationship with Alice and her family, he did not qualify as her "uncle." The word "uncle" is not defined in the Utah Code, nor was the jury given an agreed-upon definition of the word in the instructions. In its most ordinary usage, the word is commonly understood to mean the brother of a parent.[10] But on the evidence presented at trial, a jury could conclude that Francis did not qualify. After all, he was at most the brother of Alice's stepmother (as opposed to being the brother of Alice's biological mother), and there was also evidence suggesting that he was actually the half brother of her stepmother. If the evidence were viewed in the light most favorable to the defense, a jury could conclude that Francis was really Alice's step-half uncle. While we in no way mean to downplay the importance of such relationships in some people's lives, a jury could rationally think that a step-half uncle is not the same thing as an uncle.

¶100 In response, the State points out that Alice testified that she considered Francis to be her "uncle." And we do recognize that, as a term of endearment, it's perhaps not uncommon for terms like "uncle" and "aunt" to be used for people who may not biologically qualify. But still, in the applicable statute, the legislature didn't include a "person who is like an uncle." The

---

10. *See Uncle*, Merriam-Webster, https://www.merriam-webster.com/dictionary/uncle [https://perma.cc/59J7-AGMD] (defining "uncle" as "the brother of one's father or mother").

legislature simply said "uncle." Utah Code § 76-5-404.1(1)(a)(v)(U). Without more guidance from either the legislature or the court, the jury here could have chosen to view the term "uncle" in its most literal sense. And if it did, the jury could conclude that Francis did not qualify.

¶101 We also believe that a jury could rationally think that Francis was not a "cohabitant" of one of Alice's parents. Like "uncle," the term "cohabitant of a parent" is not further defined for purposes of section 76-5-404.1. But in other contexts, the term "cohabitant" is often understood to refer to something akin to a romantic partner. For example, Merriam-Webster's Dictionary links the noun "cohabitant" to the verb "cohabit," which the dictionary then defines as meaning "to live together as or as if a married couple."[11] This word often carries similar meanings in legal contexts. Black's Law Dictionary defines the term "cohabitation" as meaning "[t]he fact, state, condition, or practice of living together, esp. as partners in life, usu. with the suggestion of sexual relations." *Cohabitation*, Black's Law Dictionary (12th ed. 2024). In a family law context, courts conduct a cohabitation analysis to determine whether "an unmarried couple has entered into a relationship akin to that generally existing between husband and wife." *Scott v. Scott*, 2020 UT 54, ¶ 35, 472 P.3d 897 (quotation simplified). And in the Utah Code, the term "cohabitant" is sometimes defined using the Cohabitant Abuse Procedures Act. *See, e.g.*, Utah Code § 77-36-1(1); *see also State v. Ellis*, 2014 UT App 185, ¶ 21, 336 P.3d 26. By incorporation, that statute contains multiple definitions for the term "cohabitant," many of which are expressly romantic or sexual in nature, including a person who "is or was a spouse of the other party," "is or was living as if a spouse of the other party," "has or had one or more children in common with the other party," "is the

---

11. *See Cohabit*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cohabitant [https://perma.cc/LVL3-KD6U].

biological parent of the other party's unborn minor child," or "is or was in a consensual sexual relationship with the other party." Utah Code § 78B-7-102(7)(a)(i), (ii), (iv), (v), (vii).

¶102 The State points out, however, that the term "cohabitant" at least sometimes can refer to a relationship that is not romantic or sexual. The statute just cited, for example, includes two definitions that are not romantic or sexual, including a person who "is related by blood or marriage to the other party as the individual's parent, grandparent, sibling, or any other individual related to the individual by consanguinity or affinity to the second degree," as well as a person who "resides or has resided in the same residence as the other party." *Id.* § 78B-7-102(7)(a)(iii), (vi). And in this case, we also take the State's point that Francis had close ties to Alice's family and lived with them for about two years. So if the jury understood "cohabitant" in terms of residence, we agree with the State that the jury could think that Francis did qualify as a cohabitant.

¶103 But again, the question is whether, viewing the evidence in the light most favorable to Francis, there was a rational basis in the evidence to see things the other way. Without any further guidance from the legislature or the district court about what the term "cohabitant of a parent" meant in this context, we believe that the jury could have rationally concluded that the term meant something romantic or sexual. And if it understood the term this way, it could conclude that Francis did not qualify. We accordingly conclude that the district court erred in not giving the requested instruction.[12]

---

12. It's true that the State proposed other theories of nonconsent to the jury. In its appellate brief, the State suggests that Francis also was not entitled to the proposed instruction because the evidence of the other theories of nonconsent was strong. But the

(continued…)

¶104  As with the issue relating to Stepmother's testimony, however, Francis must show that he was prejudiced. And an "error is prejudicial if there is a reasonable likelihood that the error affected the outcome of the proceedings." *State v. Norton*, 2021 UT 02, ¶ 81, 481 P.3d 445 (quotation simplified); *see also Reece*, 2015 UT 45, ¶ 40 (concluding that an error relating to a lesser included offense would not be "harmful unless there is a reasonable likelihood that the jury would have acquitted" the defendant of the greater offense and "convicted him" of the lesser included offense); *State v. Payne*, 964 P.2d 327, 334 (Utah Ct. App. 1998) (concluding that the question is "whether, even though there was a rational basis in the evidence for giving the requested [lesser included offense] instruction, the evidence of the greater offense was so strong that there is no substantial likelihood of a different outcome had the requested instruction been given"). Here, we're not persuaded that there is a reasonable probability that, if the jury had been given the proposed lesser included offense instruction, it would have acquitted Francis of forcible sexual abuse and convicted on the lesser offense. This is so for several reasons.

¶105  First, although the jury could have concluded that Francis did not qualify as Alice's uncle, it could also have concluded that he did. After all, the statutory and instructional silence here cuts both ways. And again, he was the brother (or perhaps the half-brother) of Stepmother. From this, a jury could think that he did qualify. So too with the question of whether he was a cohabitant

State's briefing on this is somewhat perfunctory. And while we do believe that these alternative rationales appropriately factor into the prejudice analysis, we don't agree that, viewing the evidence in the light most favorable to Francis's theory, the evidence relating to these other theories was so compelling that the jury simply could not find otherwise. As a result, even with these alternative theories, we conclude that the court should have given the proposed instruction.

of one of her parents. Without any definition foreclosing this possibility, we think there's at least some chance that the jury would have concluded that the term included Francis, given that he lived with the family for a period of about two years.

¶106 Second, as discussed, the element at issue was whether Alice consented to the sexual touching. Separate from the position of special trust questions, the jury was given several other options by which it could conclude that Alice did not consent. These included that Francis "knew [Alice] was unconscious, unaware that the act was occurring, or was physically unable to resist," as well as that Francis "enticed or coerced [Alice] to submit or participate."

¶107 The jury believed Alice's testimony that some of the touching had occurred—it had to, otherwise there would have been no basis for its decision to convict him on two counts of forcible sexual abuse. In addition to describing the sexual touching, Alice testified that Francis would give her pills and drugs; that he would often touch her after she had taken drugs and was "high as a kite," at which point Francis would "kind of just go for it" without "necessarily ask[ing] or anything"; and that "[a] lot of the time," Francis would start touching her while she "was asleep" and that she would "would wake up to" Francis touching her. All of this testimony would have established Alice's nonconsent in ways that were independent of the "uncle" or "cohabitant of a parent" theories at issue. And yet we've been given no real basis from the record to conclude that it's reasonably likely that the jury would have believed Alice's testimony that the touching occurred, but that it would not have believed her testimony that this touching often occurred while she was impaired. Put differently, it seems from the record that these aspects of her testimony largely rose and fell together.

¶108 As a result, we're not persuaded that it's reasonably likely that, if the jury had been given this instruction, it would have

acquitted Francis of the charged offenses and convicted him of the lesser included offenses instead. We therefore reject this argument for lack of prejudice.

## IV. Unanimity Instructions

¶109   Francis argues that the district court erred by not giving instructions that would have required the jury to unanimously agree (1) "which specific act formed the basis for the counts that resulted in conviction" and (2) the particular "theory of nonconsent." We disagree.

¶110   First, we conclude that Francis waived any claim relating to unanimity regarding the particular acts. As discussed above, Francis did initially request such an instruction. But after discussing the issue with the prosecutor during a recess, defense counsel informed the court, "I think we've resolved a lot in terms of making some slight changes to the elements so there's fewer alternatives, which . . . I think, takes care of most of the . . . special verdict form . . . and unanimity." She then said, "I think the *only* issue left from my perspective is unanimity as it relates to theories of consent." (Emphasis added.)

¶111   Under the invited error doctrine, courts will not analyze a claim "when counsel, either by statement or act, affirmatively represented" to the district court that "he or she had no objection to the proceedings." *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (quotation simplified). This doctrine "arises from the principle that a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." *State v. Williams*, 2020 UT App 67, ¶ 33, 462 P.3d 832 (quotation simplified). Here, defense counsel's statement to the court was a clear representation that she was no longer requesting an instruction that would ask jurors to be unanimous as to a particular act. In this sense, she seems to have withdrawn

the earlier request for such an instruction. We therefore conclude that Francis waived any such claim.[13]

¶112 Second, we agree with the State that Francis was not entitled to an instruction requiring unanimity on theories of nonconsent.[14] In *State v. Hummel*, our supreme court held that "the constitutional requirement of unanimity is limited to those matters identified as *elements* of a crime in the substantive criminal law." 2017 UT 19, ¶ 65, 393 P.3d 314 (emphasis in original). The court held that "[m]ere examples of ways of fulfilling such elements," such as "theories (or methods or modes) of a crime," "are not a necessary part of a verdict, and thus fall beyond the requirement of unanimity." *Id.* ¶¶ 3, 65.

¶113 The situation before the court in *Hummel* illustrates this distinction. *Hummel* involved an appeal from a theft conviction, *id.* ¶ 1, and the statute required proof that the defendant had "obtained or exercised unauthorized control over the property of another with a purpose to deprive him thereof," *id.* ¶ 15 (quotation simplified). The statute then listed various "ways that one may exercise unauthorized control over the property of another." *Id.* ¶ 19. On appeal, the supreme court held that the defendant was not entitled to an instruction requiring jurors to be unanimous on which "way[]" the defendant had committed the theft offense. *Id.* ¶ 65. The court noted that the various options

13. On appeal, Francis does not argue that defense counsel provided ineffective assistance by withdrawing this portion of the request for a unanimity instruction.

14. As noted above, Francis proposed this instruction relating to counts two through five of the information—namely, the three counts of forcible sexual abuse relating to Alice and the one count of object rape relating to Lacy. As also noted, the jury acquitted Francis of one of the forcible sexual abuse counts, so this argument applies only to the counts for which he was convicted.

listed in the statute did not "purport[] to define a separate crime," but instead tied into the "single crime of theft," and the court regarded these as being "exemplary means of satisfying" the element in question (which, again, was having "obtained or exercised unauthorized control over the property of another with a purpose to deprive him thereof"). *Id.* ¶¶ 60–61 (quotation simplified). The court accordingly held that the unanimity requirement applies to "those matters identified as *elements* of a crime," but it does not apply to each "'theory' of the crime charged" or "[m]ere examples of ways of fulfilling such elements." *Id.* ¶¶ 64–65 (emphasis in original).

¶114   Here, the element in question was whether Francis touched Alice "without [her] consent." Utah Code § 76-5-404(2)(a)(i). Another statute then said that a qualifying sexual touching would be "without consent" under a list of "circumstances." *Id.* § 76-5-406(2). But a "circumstance" is not the same thing as an "element," and we regard that list as being similar in kind to the list involved in *Hummel*, which simply set forth examples of how the element could be satisfied. As in *Hummel*, we accordingly conclude that the statutory list at issue doesn't purport to "define a separate crime." 2017 UT 19, ¶ 60.

¶115   Therefore, while the jury was required to be unanimous in its conclusion that Francis sexually touched Alice without her consent, it was not required to be unanimous as to why it believed that Alice did not consent. Francis therefore was not entitled to a unanimity instruction on this element, and the court did not err in denying the request.

## V. Cumulative Error

¶116  Finally, Francis asks us to apply the cumulative error doctrine. A "court must make three determinations before reversing a verdict or sentence under the cumulative error doctrine: it must determine that (1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the

cumulative effect of all the potentially harmful errors undermines its confidence in the outcome." *State v. Suhail*, 2023 UT App 15, ¶ 153, 525 P.3d 550 (quotation simplified).

¶117 As indicated, we conclude that the district court committed two errors, both of which related to the charges involving Alice: (1) not allowing Stepmother to give her opinion about Alice's character for truthfulness, and (2) not giving a lesser included offense regarding the forcible sexual abuse charges relating to Alice. But even if we aggregate the effect of these errors, we still see no reasonable likelihood of a different result. This is so largely for the reasons given above, namely:

- Alice testified and was cross-examined, and the jury had the opportunity to assess her credibility firsthand.

- The charges relating to Alice and Lacy were tried together, Francis has not argued that the court should have separated the cases, and Francis has not challenged the State's ability to argue to the jury that their accounts were mutually reinforcing.

- In his interviews with detectives, Francis acknowledged that his relationships with Alice and Lacy were "not appropriate," and he further admitted that he "shouldn't have [had] friends that young." Francis also admitted that he was around both of them while they were using drugs and alcohol. Moreover, when asked about the writing on the wall in Lacy's garage, Francis admitted that it was his handwriting, and he did not deny that it was about Lacy, thus giving credence to Lacy's claim that Francis had an inappropriate and romantic interest in her.

¶118 This collective evidence was the crux of the State's case, and the two errors we've identified were of somewhat limited importance in the face of all of it. True, Stepmother should have been allowed to offer her opinion of Alice's truthfulness; but as

discussed, the jury had already heard evidence from which it likely would have assumed that Stepmother had a negative view of Alice's truthfulness anyway, so we're not persuaded that the extra answer would have been that significant. And while we've concluded that Francis was entitled to a lesser included offense instruction relating to some of the charges involving Alice, we're not persuaded that the jury would actually have agreed that Francis was not Alice's uncle or a cohabitant of her parent. This proposed instruction related to just one of the six theories of nonconsent, and the jury seems to have accepted the evidence of nonconsent relating to the some of the various theories.

¶119   In these circumstances, our confidence in this verdict is not undermined, even by the cumulative effect of these two alleged errors. We therefore decline to reverse for cumulative error.

CONCLUSION

¶120   We conclude that the court did not abuse its discretion when it admitted Expert's testimony, nor did it err in denying the request for the two proposed unanimity instructions. Although the court did err in limiting Stepmother's testimony and in not giving the jury an instruction on a lesser included offense, we conclude that Francis was not prejudiced by these errors, either individually or cumulatively.

¶121   Francis's convictions are therefore affirmed.

———————